Phillis Ann STODDARD, et al., Plaintiff,

v.

Rodney S. QUINN, Defendant.

Civ. No. 84–0208–P.

United States District Court, D. Maine.

Aug. 31, 1984.

Phyllis Ann and Kenneth Stoddard, pro se.

Peter J. Brann, Asst. Atty. Gen., Augusta, Me., for defendant.

## OPINION AND ORDER

GENE CARTER, Judge.

In this action plaintiffs Phyllis Ann Stoddard and Kenneth Stoddard challenge the constitutionality of 21 M.R.S.A. § 494 (1983 & Supp.1983–1984), which prescribes requirements independent candidates must meet in order to be placed on the state election ballot. Plaintiffs claim requirements that independent candidates obtain a minimum number of signatures upon a nominating petition and that nominating petitions be filed by April 1 in the election year violate their First and Fourteenth Amendment rights. Jurisdiction is properly asserted under 28 U.S.C. §§ 1331, 1343(3) and 2201, and 42 U.S.C. § 1983.

Plaintiffs are husband and wife. Mrs. Stoddard seeks to have her name placed on the ballot as an independent candidate for

the United States Senate in the 1984 general election. The Secretary of State has refused to place Mrs. Stoddard's name on the ballot because she failed to meet the requirements of 21 M.R.S.A. § 494. Mr. Stoddard is an independent candidate for the United States House of Representatives. The Secretary of State has determined that Mr. Stoddard has met all requirements necessary to have his name placed on the ballot. Because Mr. Stoddard has successfully completed the statutory nomination requirements, his standing as a plaintiff is based solely on his status as a voter who intends to vote for Mrs. Stoddard.

Section 494 sets forth the requirements for nomination petitions for independent candidates. Nomination petitions for candidates for United States Senator who are not associated with a qualified party[1] must be signed by at least 4,000 and not more than 6,000 voters. *Id.* § 494(5)(C). A nominating petition must be filed in the office of the Secretary of State by April 1 of the election year in which it is to be used. *Id.* § 494(9). No signatures may be obtained before January 1 of the election year. *Id.* § 494(6). Thus all signatures must be obtained in the months of January, February and March.

The parties have stipulated to the material facts in this action. Mrs. Stoddard filed her nominating petition for United States Senate on April 2, 1984.[2] The Secretary of State determined the petitions contained 2,389 valid signatures within the meaning of section 494. Because the total number of signatures fell short of the 4,000 required by section 494(5)(C), the Secretary of State refused to certify the nomination of Mrs. Stoddard.

On or before June 28, 1984, Mrs. Stoddard submitted additional nominating petitions containing 1,771 valid signatures within the meaning of section 494. The additional signatures brought the total number of valid signatures to 4,060.

Mr. and Mrs. Stoddard filed this action on July 3, 1984. They seek a judgment declaring that the filing deadline and signature requirements of section 494 are unconstitutional. They also request the Court to enjoin the Secretary of State from enforcing the filing deadline and minimum signature requirement as grounds for refusing to place Mrs. Stoddard's name on the ballot as an independent candidate for United States Senator in the general election to be held on November 6, 1984.

The parties stipulate that Mrs. Stoddard has submitted petitions containing more than the minimum number of signatures required by section 494(5)(C). The only defect in Mrs. Stoddard's effort to gain access to the ballot, therefore, is her failure to file petitions containing the requisite number of signatures by or on the deadline of April 2, 1984. *Id.* § 494(9). The question whether the signature requirement, standing apart from the filing deadline, is constitutional is not presented by these facts.[3]

## I.

The filing deadline and petition signature requirement are ballot access restrictions which may limit the field of candidates from which voters may choose. The impact of these restrictions on voters implicates fundamental rights protected by the First Amendment, as applied to the states through the Fourteenth Amendment. *Anderson v. Celebrezze,* 460 U.S. 780, 787, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547, 556 (1983). First, ballot access restrictions

---

**1.** For the means by which a party may be qualified to hold a primary election, *see* 21 M.R.S.A. § 321 *et seq.* (1983 & Supp.1983–1984).

**2.** The filing deadline was extended to April 2, 1984 because April 1 fell on a Sunday.

**3.** The United States Supreme Court has made it clear that the state has the "undoubted right to

require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot ...." *Anderson v. Celebrezze,* 460 U.S. at 789, n. 9, 103 S.Ct. at 1570, n. 9, 75 L.Ed.2d at 557, n. 9; *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974).

may burden the fundamental right of individuals to associate for the advancement of political beliefs. *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569–70, 75 L.Ed.2d at 556–57; *Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). Second, such restrictions burden the right of qualified voters to cast their votes effectively. *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569–70, 75 L.Ed.2d at 556–57, *Williams,* 393 U.S. at 30–31, 89 S.Ct. at 10.

Not all ballot access restrictions are unconstitutional, however. The Supreme Court has observed, " 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.' " *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570, 75 L.Ed.2d at 557 (quoting *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1975)).

The United States Supreme Court had occasion recently to determine the constitutionality of a state filing deadline as applied to John Anderson's 1980 independent candidacy for president in *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). Three years earlier, this Court had overturned the filing deadline applied to Mr. Anderson's independent presidential bid here in Maine. *Anderson v. Quinn,* 495 F.Supp. 730 (D.Me.1980) *aff'd* without opinion, 634 F.2d 616 (1st Cir.1980). Both cases have significant precedential value, but the analyses utilized are somewhat different. This Court relied primarily upon the Equal Protection Clause in *Anderson v. Quinn.* In *Anderson v. Celebrezze,* the Supreme Court, diverging from earlier decisions,[4] based its conclusions directly on the First and Fourteenth Amendments and did not engage in a separate equal protection analysis. *Anderson v. Celebrezze,* 460 U.S. at 787, n. 7, 103 S.Ct. at 1569, n. 7, 75 L.Ed.2d at 556, n. 7. Because *Anderson v. Celebrezze* is the latest pronouncement of the Supreme Court regarding state imposed restrictions on independent candidacies, this Court will follow closely the analysis set forth in that decision.[5]

In *Anderson v. Celebrezze,* candidate Anderson submitted to the Ohio Secretary of State a nominating petition containing the requisite number of signatures, but it was tendered on May 16, 1980, nearly two months after the March 20 deadline. *See Anderson,* 460 U.S. at 783–784, 103 S.Ct. at 1566–67, 75 L.Ed.2d at 553–54. The Supreme Court held the filing deadline, as applied to Mr. Anderson, unconstitutional. It employed the following analysis:

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

460 U.S. at 789, 103 S.Ct. at 1570, 75 L.Ed.2d at 558 (citation omitted).

---

**4.** Earlier cases had relied upon the Equal Protection clause. See *Anderson v. Celebrezze,* 460 U.S. at 787, n. 7, 103 S.Ct. at 1569, n. 7, 75 L.Ed.2d at 556, n. 7.

**5.** The Court does not understand *Anderson v. Celebrezze* to preclude an equal protection analysis. Rather, *Anderson v. Celebrezze* makes it clear that any burdens upon First Amendment associational and voting rights must be justified by important state interests, even if they fall equally on all candidates.

## II.

The first step in the analysis set forth in *Anderson* is to identify the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments. *Anderson*, 460 U.S. at 790, 103 S.Ct. at 1570, 75 L.Ed.2d at 558. The Supreme Court has recognized that an early filing deadline "may have a substantial impact on independent-minded voters." *Id.* The Court observed: "In election campaigns, particularly those which are national in scope, the candidates and the issues simply do not remain static over time." *Id.*

Ohio's deadline burdened independent candidacies in two respects. First, Ohio's March 20 filing deadline, which occurred five months earlier than major party conventions, prevented independent candidates from emerging to represent the views of voters dissatisfied with candidates of the major parties. *Id.* 460 U.S. at 790–791, 103 S.Ct. at 1570–71, 75 L.Ed.2d at 558–59. Second, Ohio's filing deadline posed a substantial obstacle to independent candidates' organizing efforts because of the remoteness of primary campaigns and the general election:

> Volunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign.

*Id.* 460 U.S. at 794, 103 S.Ct. at 1572, 75 L.Ed.2d at 560 (footnote omitted). *See Bradley v. Mandel*, 449 F.Supp. 983, 986–87 (D.Md.1978). The Court concluded that the Ohio filing deadline burdened the First Amendment rights of an identifiable segment of voters: "those voters whose political preferences lie outside the existing political parties." [6] *Anderson*, 460 U.S. at 794, 103 S.Ct. at 1573, 75 L.Ed.2d at 561.

The statutory election scheme for Maine state elections differs in some respects from the presidential electoral scheme considered in *Anderson*. In Maine, all party candidates for state office are nominated by primary occurring on the second Tuesday of June. 21 M.R.S.A. § 448. In contrast, major party presidential candidates are nominated by conventions in July or August. Thus, under the Maine scheme, the gap between the filing deadline for independent candidates and the nomination of party candidates is somewhat shorter than that of the Ohio scheme considered in *Anderson*. *See Anderson*, 460 U.S. at 791, 103 S.Ct. at 1571, 75 L.Ed.2d at 559.

Despite these differences, however, the obstacles to independent candidates caused by the Ohio filing deadline are, or may be, present in Maine's scheme. A campaign for United States Senate in Maine is not immune from the volatile forces that may create a demand for representation of the views of voters who become dissatisfied with available party choices at some late date in the campaign. Lacking a substantial record, the Court is not in a position to compare the volatility of a Maine state election to that of a national election. At best, it may be observed that the concerns expressed in *Anderson* relating to the unpredictability of a national election are, potentially at least, equally applicable to a Maine state election.

More significantly, Maine's filing deadline may hinder independent candidates' organizing and signature-gathering efforts. *See Anderson*, 460 U.S. at 792, 103 S.Ct. at 1572, 75 L.Ed.2d at 560. Plaintiffs argue that the Maine filing deadline impairs their signature-gathering efforts. They point out that all signatures must be collected between January 1 and April 1, 21 M.R.S.A. §§ 494(6) & (8), a time when adverse weather conditions prevail in Maine. They argue that signatures must be acquired at a time of year when election issues are undefined and the voters are apathetic. *See Anderson*, 460 U.S. at 792, 103 S.Ct. at 1572, 75 L.Ed.2d at 560; *Bradley v. Mandel*, 449 F.Supp. at 986–87. In addition, plaintiffs claim that, as indepen-

---

6. The Ohio deadline had the additional defect of imposing a significant state-imposed restriction on a nationwide electoral process. 460 U.S. at 795, 103 S.Ct. at 1573, 75 L.Ed.2d at 561–62. This concern obviously is not relevant to Maine's filing deadline.

dents, they do not have the benefit of a statewide political organization to assist in their efforts, and, as persons of limited means, they lack funds to pay the costs of canvassing.

The parties have stipulated that several candidates gained places on the ballot in the past decade through the nomination petition procedure of section 494. The Secretary of State argues that the success of past independent candidates in obtaining ballot access belies the contention that the state law restricts ballot access.

■ The facts do not support the Secretary's argument. Seven candidates for statewide office successfully completed nomination petition requirements similar to those currently in effect in the election years of 1980, 1982, and 1984.[7] Three independent candidates, including Mrs. Stoddard, tendered nomination petitions, but did not meet the deadline.

The record gives no indication of how many potential candidates attempted to meet the requirements but failed, how many were unable to make a decision prior to the filing deadline, and how many were deterred from seeking office by the April 1 filing deadline. In the absence of such evidence, the fact that seven candidates filed successfully and three unsuccessfully in the past three elections cannot be put in proper perspective and is of slight probative value. These facts do not controvert plaintiffs' assertion that the early deadline posed a substantial obstacle to Mrs. Stoddard's gaining a place on the ballot. Nor do they discredit the Supreme Court's ob-

servation in *Anderson* that an early filing deadline hinders independent candidates' signature-gathering and organizational efforts.[8]

■ It is clear, then, that the April 1 filing deadline places a burden on an identifiable segment of Maine voters—those who may be dissatisfied with the major parties' choices. *See Anderson*, 460 U.S. at 792, 103 S.Ct. at 1572, 75 L.Ed.2d at 560. The Supreme Court explained how such a restriction impinges on First Amendment rights:

> By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas. Historically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream. In short, the primary values protected by the First Amendment—"a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686]—are served when election campaigns are not monopolized by the existing political parties.

*Anderson*, 460 U.S. at 795, 103 S.Ct. at 1573, 75 L.Ed.2d at 561 (footnote and citations omitted).

---

**7.** Seven independent candidates for statewide offices listed in the stipulated facts faced a later deadline and different signature requirements than those currently in effect.

**8.** *See Anderson*, 460 U.S. at 792, 103 S.Ct. at 1572, 75 L.Ed.2d at 560. The Court in *Anderson* relied upon the finding of a three-judge court in *Bradley v. Mandel*, 449 F.Supp. 983 (D.Md.1978) (on remand from *Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977)). In *Bradley*, the plaintiff was an independent candidate for United States Senate; Maryland law had required him to file nominating petitions containing signatures of 3% of registered voters eligible to vote for United States Senate by

March 8 in a presidential election year. The District Court found that the early filing deadline hindered independent candidacies in the following respects: (1) It made it difficult for Bradley to recruit volunteers for signature-gathering. (2) Adverse winter weather conditions hindered signature-gathering. (3) Media coverage was very difficult to obtain. (4) The signature-gathering effort was unduly burdened by the requirement that it take place before primary election campaigns had begun in earnest and issues had developed. (5) Funds to aid signature-gathering were difficult to raise. *Id.* at 986.

## III.

■ The second step in the *Anderson* analysis is "to identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." 460 U.S. at 789, 103 S.Ct. at 1570, 75 L.Ed.2d at 558. The Secretary of State asserts that the important interest justifying the filing deadline is equal treatment of all candidates. Major party candidates who are nominated by primary must file their nominating petitions on the same date as independent candidates. 21 M.R. S.A. § 445(8).[9] The title of the bill that established current filing deadlines for independent candidates communicates the legislature's intent to treat all candidates equally.[10]

The Ohio filing deadline overturned by the Supreme Court in *Anderson* applied equally to candidates participating in a primary. 460 U.S. at 799, 103 S.Ct. at 1575. 75 L.Ed.2d at 564. The Supreme Court observed, however:

> [B]oth the burdens and the benefits of the respective requirements are materially different, and *the reasons for requiring early filing for a primary candidate are inapplicable to independent candidates in the general election.*

*Id.* (emphasis added). The Supreme Court found that the consequences of failing to meet the deadline were different for party primary participants and independents, since the parties' nominees would appear on the general election ballot even if they had not met the filing deadline. *Id.* Under Ohio's scheme, the major parties were able to include consideration of all events prior to their conventions in their selection of a nominee, whereas "the independent's judgment must be based on a history that ends in March." *Id.* 460 U.S. at 800–801, 103 S.Ct. at 1575–76, 75 L.Ed.2d at 564–65. Additionally, the early filing deadline for

party primary candidates was adequately justified by administrative concerns which did not apply to independent candidacies. *Id.* 460 U.S. at 801, 103 S.Ct. at 1576, at 565. Finally, the successful primary candidate acquires a corresponding benefit—the support of an experienced political organization—for having entered the fray earlier. *Id.* This benefit was not enjoyed by independent candidates. *Id.*

Under Maine's electoral scheme, a candidate can be nominated only by primary or petition. *See* 21 M.R.S.A. § 441(1). Thus *all* candidates, party hopefuls and independents alike, face the same consequence for failure to meet the filing deadline. In this respect, Maine's scheme is distinguishable from the Ohio scheme invalidated by the Supreme Court.

In other respects, however, the filing deadline does not further the state's stated objective of equal treatment. First, parties have until the second Tuesday of June to select their nominees; an independent's judgment must be based on a history that ends April 1. *See Anderson*, 460 U.S. at 800–801, 103 S.Ct. at 1575–76, 75 L.Ed. 2d at 564–65. Second, the Secretary concedes that the early filing deadline for independents is not administratively necessary. The parties have stipulated that 127 days would be sufficient time to consider any nomination challenges and to prepare ballots. Those administrative concerns require a deadline no earlier than approximately July 1. The record contains no information concerning any administrative necessity for the April 1 filing deadline for primary candidates. In view of the fact that the primary election is nearly five months earlier than the general election, however, it is obvious that a filing deadline dictated only by administrative considera-

---

**9.** Candidates for nomination by primary election who are running for United States Senate must collect 2,000 to 3,000 signatures from enrolled members of their party. 21 M.R.S.A. § 445(2) and (5)(B).

**10.** The bill was entitled, "An Act to Improve Election Laws and to Make Equal Application of Legal Requirements of Independents, Democrats and Republicans in All Respects." *See* 1979 Me.Laws ch. 359, § 3, amending 21 M.R. S.A. § 494.

tions would be substantially later for independents than for primary candidates.[11]

Finally, under Maine's scheme, the primary candidate enjoys a potential benefit corresponding to the early deadline—"the automatic support of an experienced political organization"—that is not enjoyed by independent candidates who are required to meet the same deadline. *See id.* 460 U.S. at 800, 103 S.Ct. at 1576, 75 L.Ed.2d at 565.

The Secretary of State's claim that the early filing deadline is justified by a state interest in equal treatment of all candidates suffers from the same defect as a similar claim made by the State of Ohio in *Anderson:* the filing deadline simply does not achieve the stated goal. *See id.* Equality is not achieved by applying the same deadline to substantially different types of candidacies. The Supreme Court observed: "[S]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike." *Id.* (quoting *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971)).

### IV.

■ The final step in the analysis set forth in *Anderson* is consideration of the extent to which legitimate state interests make it necessary to burden Plaintiffs' rights. *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570, 75 L.Ed.2d at 558. Equal treatment is the only state interest asserted by the Secretary to justify the filing deadline for independent candidates. Since the filing deadline fails to further that interest, there is no interest asserted by the state justifying *any* burden on plaintiffs' rights.

The Court determines that the filing deadline burdens First Amendment rights of association and franchise. In the absence of any assertion of legitimate state interests served by the deadline, it is unnecessary to weigh the extent of the burden against the strength of state interests. The inescapable conclusion is that the filing deadline for United States Senate candidates set forth in 21 M.R.S.A. § 494(9) violates the First and Fourteenth Amendments.[12]

■ The Court is acutely mindful of the principle that "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1570, 75 L.Ed.2d at 557. The Secretary of State in this case, however, has failed entirely to meet its burden of showing how the filing deadline advances the state's important regulatory interests. The Court cannot be blind to the fact that restrictions on independent candidacies are enacted by members of major parties, who have some level of direct interest in the success or failure of independent candidacies. Laws enacted by major parties that tend to quell independent candidacies must be scrutinized carefully in order to pre-

---

**11.** Under the current scheme, time must be allowed in advance of the primary date, or the general election date, for ballot preparation and review and challenge of petitions. Maine's statutory provisions for review and challenge of petitions for nomination by primary and for nomination by petition are substantially similar. *Compare* 21 M.R.S.A. § 447 with 21 M.R.S.A. § 496. Since the procedure must be completed by the second Tuesday in June for primary candidates, but not until November for independents, the commencement of the time period required for their completion would occur substantially earlier for primary candidates. It should be emphasized at this point that the Court is making no judgment as to the State's interest in having an early filing deadline for candidates. The only purpose of this discussion is to determine whether the State's goal of "equal treatment" is achieved by the early filing deadline applied to independent candidates.

**12.** Again, the Court's decision is based directly on the First Amendment, as incorporated in the due process clause of the Fourteenth Amendment. *See Anderson, supra,* 460 U.S. at 787, at 7, 103 S.Ct. at 1569, at 7, 75 L.Ed.2d at 556, at 7. Thus the approach undertaken in *Anderson* is followed. *Id.* The principle reflected in the *Anderson* approach is that if a burden on First Amendment associational and voting rights cannot be justified by important state regulatory interests, the state regulation is invalid. Under these circumstances, it is unnecessary to decide the question as to whether the regulation is discriminatory under the Equal Protection Clause.

serve First Amendment rights of association and voting. To reiterate the Supreme Court's statement of the applicable foundational principle:

> [T]he primary values protected by the First Amendment—"a profound historical commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] (1964)—are served when election campaigns are not monopolized by the existing political parties.

*Id.*

### V.

The Secretary of State also contends that, even if the filing deadline is unconstitutional, the Court should not grant the requested injunction because plaintiffs delayed in bringing this action.

Plaintiffs were informed that Mrs. Stoddard failed to obtain a sufficient number of signatures to gain a place on the ballot in a letter from the Secretary of State's office, dated April 4, 1984. Certainly, an action could have been brought at that time. This action was not filed, however, until July 3, 1984. The Secretary contends that the delay deprives the parties of the opportunity to develop an exhaustive factual and legal record, and the loser of the opportunity to appeal. In addition, the Secretary argues that insufficient time remains for Maine voters to exercise their statutory right to challenge Mrs. Stoddard's petition signatures. The Secretary urges the Court to refuse the injunction due to prejudice allegedly caused by the Plaintiffs' delay.

■ The Court is unconvinced that defendant has suffered, or will suffer, sufficient prejudice to justify withholding the requested injunction. The Secretary relies on the analysis set forth in *Fishman v. Schaffer*, 429 U.S. 1325, 97 S.Ct. 14, 50 L.Ed.2d 56 (1976). There, United States Supreme Court Justice Marshall, as Circuit Justice, denied an application for an injunction ordering officials of the State of Connecticut to place on the 1976 ballot the names of the Communist Party Presidential and Vice Presidential candidates.

*Fishman* is inapposite. It is a decision of a single justice of the Supreme Court on a request for injunctive relief. A single justice of the Supreme Court exercises his power to grant such relief " 'sparingly and only in the most critical and exigent circumstances.' " *Id.* at 1326, 97 S.Ct. at 15; (*quoting Williams v. Rhodes*, 89 S.Ct. at 1, 2, 21 L.Ed.2d at 69, 70 (1968) (Stewart, J., in chambers).[13]

■ The Secretary also claims that the plaintiffs' request for an injunction should be barred under the doctrine of laches. Laches "is an equitable doctrine which penalizes a litigant for negligent or wilful failure to assert his rights." *Valmor Products Co. v. Standard Products Corp.*, 464 F.2d 200, 204 (1st Cir.1972). The plaintiffs brought this action approximately three months after their cause of action accrued and approximately four months before the election. Plaintiffs claim their action was not brought sooner because they required time to collect additional signatures and to evaluate their chances of success in this litigation. Under these circumstances, the Court is unable to find that the plaintiffs were willful or negligent in their failure to bring the action earlier.

■ It is true that the Secretary of State probably will not have sufficient time to appeal prior to the general election. After the election, the case arguably will be

---

13. *Fishman* is distinguishable in other important respects. First, the constitutionality of the challenged statutory provision posed a "difficult and novel question," for which there was no clear precedent. 429 U.S. at 1328–29, 97 S.Ct. at 16–17. Second, the State argued that the injunction would have a "chaotic and disruptive effect upon the electoral process because presidential ballots had already been printed, and some absentee ballots had already been distributed. (Justice Marshall's decision was issued October

moot.[14] The Secretary's right of appeal is outweighed, however, by the First and Fourteenth Amendment rights of voters.

Finally, the Secretary claims that the public will be prejudiced if the requested injunction is granted because there will be insufficient time for voters to challenge petition signatures. *See* 21 M.R.S.A. § 496.[15] The doctrine of laches is intended to prevent prejudice to the defending party with respect to the presentation of his case. The United States Supreme Court has stated:

> The law of laches, like the principle of the limitation of actions, was dictated by experience and is founded in a salutary policy. The lapse of time carries with it the memory and life of witnesses, the muniments of evidence, and other means of proof.

*Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961) (*quoting Brown v. County of Buena Vista*, 5 Otto (95 U.S.) 157, 161, 24 L.Ed. 422 (1877)). The possibility that voters of the State will be unable to challenge Mrs. Stoddard's petition signatures if the Court orders her name placed on the ballot has no bearing upon the Secretary's ability to effectively argue its position in this litigation. This is not a proper ground for relief under the doctrine of laches.

The filing deadline, as applied to the candidacy of Mrs. Stoddard, is unconstitutional. It burdens the First and Fourteenth Amendment rights of voters. The only adequate remedy is to enjoin the Secretary of State from enforcing the filing deadline against Mrs. Stoddard. As a result, there is a possibility that voters who may wish to challenge signatures on her petition, pursuant to the statutory procedure, will have insufficient time to do so. The mere *possibility* that a voter may be deprived of his *statutory* right to challenge petitions is hardly sufficient grounds to withhold a remedy from voters who otherwise would suffer injury to their *constitutional* rights.

### Conclusion

In accordance with the foregoing, judgment will be entered:

(1) Declaring the deadline for filing nomination petitions and consent forms on behalf of independent candidates prescribed in 21 M.R.S.A. § 494(9) is unconstitutional and null and void as applied to the independent candidacy of Plaintiff Phyllis Ann Stoddard for United States Senator; and

(2) Permanently enjoining Defendant Rodney S. Quinn, his agents, servants, employees, subordinates, and all other persons acting in concert with him, from enforcing or applying the filing deadline set forth in 21 M.R.S.A. § 494(9) as a ground for failing or refusing to certify the name of Plaintiff Phyllis Ann Stoddard for inclusion on the official Maine general election ballot as an independent candidate for United States Senator in the general election to be held on November 6, 1984.

So ORDERED.

---

1, 1976.) *Id.* at 1330, 97 S.Ct. at 17. The State makes no such claim in this case.

**14.** In *Anderson,* the Supreme Court briefly noted that the appeal by the State of Ohio was not moot even though Anderson's name had been placed on the ballot per order of the trial court, and the election was long over. *Anderson,* 460 U.S. at 784, n. 3, 103 S.Ct. at 1567, n. 3, 75 L.Ed.2d at 555, n. 3. The Court relied on *Storer v. Brown,* 415 U.S. 724, 737, n. 8, 94 S.Ct. 1274, 1282, n. 8, 39 L.Ed.2d 714 (1974) for this proposition. In *Storer,* however, the trial court had denied ballot access under a state law. Since the issues presented would persist as state ballot access requirements were enforced in future elections, the Court in *Storer* stated the controversy was not moot because it was "'capable of repetition, yet evading review.'" *Id.* (quoting *Southern Pacific Terminal Company v. Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). The situation is different when ballot access is granted; the danger that the right of voters to appellate review will repeatedly be denied under mootness principles is not present. Since the Court decides that the injunction is to be granted even if the case is effectively mooted by the election, it need not resolve this conceptual difficulty.

**15.** The Secretary of State does not claim that any such challenges have been initiated or are threatened.