917 F.2d 819
 59 USLW 2318
 James L.M. CROMER, Jr.; James A. Amick; Martha N. Amick;
John B. Allen, Jr.; Marian C. Allen; Margaret W.
Kherlopian; Ellen P. Leggett; Patricia R. Goodwin;
Darlene G. Jones; Bruce L. Pearson; Julia A. Pearson;
Eddie Ruth Brawley, Plaintiffs-Appellees,
v.
STATE OF SOUTH CAROLINA, Defendant-Appellant,
and
Michael P. Cinnamon, Executive Director of the Richland
County Executive Commission; Richland County
Election Commission, Defendants.
James L.M. CROMER, Jr.; James A. Amick; Martha N. Amick;
John B. Allen, Jr.; Marian C. Allen; Margaret W.
Kherlopian; Ellen P. Leggett; Patricia R. Goodwin;
Darlene G. Jones; Bruce L. Pearson; Julia A. Pearson;
Eddie Ruth Brawley, Plaintiffs-Appellees,
v.
Michael P. CINNAMON, Executive Director of the Richland
County Executive Commission; Richland County
Election Commission, Defendants-Appellants,
and
State of South Carolina, Defendant.
 Nos. 90-2429, 90-2444.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 1, 1990.
Decided Oct. 30, 1990.
 
 Edwin Evans, Chief Deputy Atty. Gen., argued (Treva G. Ashworth, Sr. Asst. Atty. Gen., on brief), for defendant-appellant State of S.C.
 Edwin Evans, Chief Deputy Atty. Gen., argued (John C. Zilinsky, Columbia, S.C., on brief), for defendants-appellants Richland County Election Com'n and Executive Director.
 Katharine I. Butler, University of South Carolina School of Law, Columbia, S.C., argued (Randall M. Chastain, Lourie, Curlee, Barrett and Popowski, Columbia, S.C., Daniel A. Carrell, Hunton & Williams, Richmond, Va., on brief), for plaintiffs-appellees.
 Before ERVIN, Chief Judge, and PHILLIPS and WILKINSON, Circuit Judges.
 PHILLIPS, Circuit Judge:
 
 
 1
 South Carolina law allows independent candidates for election to the state House of Representatives (among other offices) to be nominated by voter petition and thereupon to have their names placed on the ballot as candidates in the state's November general election. Until 1988, access to the general election ballot by this route required only that an otherwise qualified candidate file a sufficiently supported nominating petition by August 1 preceding the general election. In 1988 the election laws were amended to require, in addition, that such a candidate file a "statement of candidacy" by the preceding March 30, a date which precedes the date on which political party primary elections are held.
 
 
 2
 The issue in this case is whether this early filing requirement constitutes an unconstitutional burden on independent candidate access to the general election ballot. On a challenge by an otherwise qualified independent candidate for the state House of Representatives, and some of his supporters, the district court held the requirement unconstitutional and ordered that the candidate's name be placed on the ballot. On this appeal by the state and the local elections commission, we agree with the district court's conclusion and affirm.
 
 
 3
 * In South Carolina, candidates for offices to be voted on in general elections, including the state House of Representatives, may be nominated and thereby appear on the general election ballot by political party primary, or political party convention, or (as "independent" candidates) by voter petition. Party primary elections are held on the second Tuesday in June of each general election year. S.C.Code Ann. Sec. 7-13-40. Since 1977, party primary candidates have been required to file a notice of candidacy by noon of March 30, approximately 70 days before the primary. S.C.Code Ann. Sec. 7-11-210. Before 1988, independent (or "petition") candidates were not required to file any separate notice of candidacy at any time; they merely had to file a petition with the requisite number of signatures (5% of the registered voters for the office) by August 1 preceding the general election; this constituted their notice of candidacy, and entitled them to have their names placed on the general election ballot. S.C.Code Ann. Sec. 7-11-70.
 
 
 4
 In 1988, however, the state legislature amended the election laws to impose upon independent candidates the same notice of candidacy filing requirements formerly applicable only to party primary candidates, i.e., that they file such a notice by March 30. S.C.Code Ann. Sec. 7-11-15(3). There is no legislative history explaining the basis for this change in the law. Under the law as it now stands, therefore, independent candidates still may file their voter petitions by August 1, but may not appear on the ballot unless they also have filed a notice of candidacy by March 30.
 
 
 5
 On March 30, 1990, the same day statements of intention of candidacy were due, the incumbent state representative in South Carolina House District 80 announced he would not run for reelection. Only one candidate submitted his statement before the end of the day. He was therefore the only candidate of his party permitted on the primary ballot, and in due course, when no other party nominated a candidate, became the sole party candidate for election in November.
 
 
 6
 Upon realizing what had happened, certain residents of the district sought to field a competing independent candidate. On June 21, 1990, James Cromer submitted a statement of candidacy and a nominating petition to the Richland County Election Commission. His petition contained 2,000 signatures, or twenty percent of the registered voters in the district. The election commission rejected his statement and petition.
 
 
 7
 Cromer and several of his supporters then filed this action against the election commission, its members, and its executive director, seeking declaratory and injunctive relief. The state was then permitted, without objection, to intervene, and the individual commissioners were dismissed.
 
 
 8
 On the plaintiffs' motion for summary judgment on the undisputed facts of record just recounted, the district court granted the motion, concluding in a brief memorandum opinion that the notice of candidacy filing requirement unconstitutionally hindered the plaintiffs' right to run as, and to vote for, an independent candidate. The court's judgment enjoined the defendants from declining to accept Cromer's otherwise regular petition and ordered that his name be placed on the general election ballot as an independent candidate. The defendants complied with this judgment, but took this appeal from it.II
 
 
 9
 The issue, simply put, is whether South Carolina's requirement that to gain access to the general election ballot an independent candidate must formally declare his candidacy approximately 70 days before party primaries and approximately 200 days before the general election imposes an unconstitutional burden on the rights of such would-be candidates and their supporters.
 
 
 10
 We start our analysis by accepting the following propositions and principles as controlling:
 
 
 11
 1. The most directly controlling authority for analysis and decision here is that provided by the Supreme Court's decision in Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), which held unconstitutional an Ohio statute that required an independent candidate for President to file both a statement of candidacy and a nominating petition in March in order to appear on the general election ballot in November.[1]
 
 
 12
 In accepting the general authority of Anderson we specifically reject the state's contention here that that decision applies only to ballot access restrictions upon candidates for national office. With other courts, we believe instead that while national candidacy is an important factor in assessing the legitimacy of such restrictions, Anderson did not turn solely on that factor, but provides general guidance for assessing ballot access challenges by local and state as well as national office candidates and their supporters. See, e.g., Dixon v. Maryland State Admin. Bd. of Election Laws, 878 F.2d 776, 779-80 (4th Cir.1989); Rainbow Coalition v. Oklahoma State Election Bd., 844 F.2d 740, 743 (10th Cir.1988); Goldman-Frankie v. Austin, 727 F.2d 603, 607 (6th Cir.1984).
 
 
 13
 2. On the other hand, we think the facts in Socialist Workers Party v. Hechler, 696 F.Supp. 190 (S.D.W.Va.1988), aff'd in part, 890 F.2d 1303 (4th Cir.1989), which upheld certain West Virginia voting regulations, including a filing deadline, against constitutional challenge, are distinguishable in critical respects from the facts in this case, and we therefore reject the state's contention that Hechler controls decision here. Specifically, we note, as did the district court in Hechler, that the challenges in that case were by third party candidates rather than, as here, an independent candidate. As we later note, and as the Hechler court also pointed out, harsher restrictions may be imposed by a state upon third party candidacies than upon independent candidacies because of the different state interests involved. See id. at 197-98.
 
 
 14
 3. From Anderson and cases upon which it in turn relied, we draw the following principles as the ones most critical to decision here:
 
 
 15
 The primary concern in assessing this or any restriction on ballot access by candidates is not the interest of the candidate but of the voters who support the candidate and the views espoused by the candidate. Anderson, 460 U.S. at 786-88, 806, 103 S.Ct. at 1568-69, 1579.
 
 
 16
 The voter interests at stake are basic associational rights secured against state action by the first and fourteenth amendments, and any restriction on ballot access by candidates necessarily burdens the rights of their supporters to some extent. Id. at 786-87, 103 S.Ct. at 1568-69.
 
 
 17
 Nevertheless, though these rights are fundamental, and any restrictions upon ballot access for particular candidates necessarily constitute a burden upon their supporters' rights, the states have countervailing interests--in protecting the electoral process from chaos and disorder, and major political parties from unfair debilitation--that may justify particular regulatory burdens upon these voters' rights. Id. at 787-88 & n. 9, 103 S.Ct. at 1569-70 & n. 9.
 
 
 18
 While one of the electoral interests which states may protect by reasonable regulation is that of the integrity of established and formally recognized major political parties, these may not extend to the effective exclusion of independent (and new party) candidacies, which serve important safety-valve purposes not adequately served by major party candidacies alone, or by the availability of write-in candidacies. Id. at 790-94, 799 n. 26, 103 S.Ct. at 1570-72, 1575 n. 26.
 
 
 19
 And as between new (third) party candidacies and independent candidacies, independent candidacies must be accorded even more protection than third party candidacies. This flows from the states' heightened interest in regulating the formation of new parties having the potential not possessed by independent candidacies for long-term party control of state government, see Storer v. Brown, 415 U.S. 724, 745, 94 S.Ct. 1274, 1286, 39 L.Ed.2d 714 (1974), in combination with the peculiar potential that independent candidacies have for responding to issues that only emerge during or after the party primary process. Anderson, 460 U.S. at 790-92, 103 S.Ct. at 1570-71.
 
 
 20
 4. To apply these basic principles in evaluating a particular ballot access restriction, Anderson mandates the following staged inquiry: first, an assessment of the "character and magnitude of the asserted injury to the rights" sought to be vindicated; next, an assessment of the "precise interests put forward by the state as justifications for the burden imposed by its rule"; third, an evaluation of the extent to which the state's asserted interests make it necessary to burden the voters' rights in the way chosen. The constitutionality of the challenged restriction is then to be made on the basis of a necessarily hard evaluative judgment of the relative weight of state interests and voters' rights. Id. at 789, 103 S.Ct. at 1570.
 
 III
 
 21
 We now proceed with the Anderson analysis of the notice of candidacy requirement here challenged.
 
 
 22
 1. We first assess the character and magnitude of the asserted injury to voter rights.
 
 
 23
 The direct effect of the pre-primary filing requirement is that the opportunity to run as an independent candidate for the office in question is effectively cut off on March 30, seven months before the November general election, which of course means that the opportunity of voters to coalesce around such a candidacy is cut off at the same time. "History ... ends" for both potential independent candidates and their supporters on that date. See Anderson, 460 U.S. at 800, 103 S.Ct. at 1576. In practical terms this means that as of March 30, the emergence of independent candidacies to respond to newly emerging issues, or to major party or candidate shifts in position, or to moral, or ethical, or mental, or physical collapses of party candidates in the seven-month interval between filing date and general election date are effectively precluded.
 
 
 24
 It is true that the specific logistical burden of filing is minimal; it involves a simple, easily done physical act, and a decision which commits to nothing. But that is not the problem. The problem is in having to make the draconian decision at a time when a rational basis for making it does not exist. At this time the party candidates have not been chosen, and even the identity of those who may become candidates may not be known. The election itself is seven months of unfolding events away.
 
 
 25
 The only bases upon which one might decide at that time to declare, essentially in the dark, an independent candidacy are (a) determination to seek nomination as an independent, whatever happens or doesn't, (b) prescience or specific foreknowledge of future events affecting issues or other candidates, or (c) willingness to act as a stand-by just in case some need should later arise. While neither of these can be gainsaid as a theoretical possibility, neither suffices as a practical basis for insuring the viability of independent candidacies as the constitutionally protected best means for voter response to late developments affecting issues or party candidates.
 
 
 26
 As we assess the "character and magnitude of the asserted injury" imposed by this requirement upon the peculiar voter interest implicated in independent candidacies, we conclude that it is practically total. It effectively cuts off the opportunity for such candidacies to develop at a time that pre-dates the period during which reasons for their emergence are most likely to occur.
 
 
 27
 Anderson bears out that the most decisive injury to independent candidacy interests imposed by such an early filing deadline is simply the premature cutting off of opportunity. This was the focal point of the Court's assessment that Ohio's requirement imposed a "particular burden" on this unique form of candidacy. See id. at 791-92, 103 S.Ct. at 1571. It is true that the Court also took into account as factors contributing to the injury some not present in this case: that the candidacy involved was one for national office, id. at 794-95, 103 S.Ct. at 1572-73; that Ohio required both candidacy declaration and petition filing at this time, id. at 792, 103 S.Ct. at 1572; and that the filing requirement for independents preceded the party primaries by five months. Id. But each of these was seen by the Court simply as add-on injuries to the central and decisive injury inflicted by imposing so early a cut-off of the opportunity to enter the political arena. See id. at 790-92, 103 S.Ct. at 1570-72.
 
 
 28
 2. We turn next to the interests put forward by the state as justifications for imposing the pre-primary filing deadline.
 
 
 29
 In its argument to this court, the state identifies in general the state's undoubted interest in promoting "the integrity and orderliness of its election," and more specifically, in diminishing the possibility of "unnecessary feuding by parties and independent candidates on the general election ballot" and in "preventing splintered parties and unrestrained factionalism." Appellant's Main Br. at 16, 17. In developing these, it emphasizes in particular that the state's pre-primary filing requirement treats independent candidates and party candidates equally. Id. at 17.[2]
 
 
 30
 We find both the "equal treatment" and "feuding and factionalism-reduction" claims of interest lacking in significance. The Anderson Court explained why this is so in rejecting similar claims respecting Ohio's interest in imposing comparable pre-primary filing deadlines for both independent and party candidates. See Anderson, 460 U.S. at 799-801, 103 S.Ct. at 1575-76 (equal treatment); id. at 801-06, 103 S.Ct. at 1576-79 (political stability). Everything said in Anderson on these two matters applies practically across the board to the comparable assertions made by the state here. Accordingly, we simply adopt Anderson 's rejection of their significance as authoritative reason for our rejection of their significance here. We summarize the reasons but briefly.
 
 
 31
 The "equal treatment" accorded by South Carolina's imposing of the same pre-filing deadline on primary and independent candidates is only superficial "equality." There are obvious administrative reasons for requiring primary candidates to file at that time that simply do not apply to independent candidates. They are therefore unequals in this respect, and equal treatment of unequals is not equality. Similarly, primary candidates derive a benefit from their organized party support that offsets the burden imposed by the filing deadline in a way not shared by the independent candidate. Here again, the two types of candidacies are unequal in a way which makes imposition upon them of equal burdens not equality of treatment. See id. at 799-801, 103 S.Ct. at 1575-76.
 
 
 32
 While the state's general interest in promoting political stability by "preventing splintered parties and unrestrained factionalism" must be recognized, it does not justify measures which effectively exclude other political aspirants than the major political parties from the political arena. A line has to be drawn here. Thus disaffiliation requirements and sore-loser provisions (which South Carolina has in place under S.C.Code Ann. Sec. 7-11-210), are justifiable measures for preventing splintering and factionalism within the major parties; but pre-primary filing deadlines are neither of these, and may actually impair rather than promote party harmony by encouraging pre-primary defalcations by splinter groups and individuals. See id. at 801-06, 103 S.Ct. at 1576-79; cf. Stevenson v. State Bd. of Elections, 794 F.2d 1176, 1178 (7th Cir.1986) (Easterbrook, J., concurring) (expressing reservation about validity of pre-primary deadline as applied to "genuine independents," but upholding validity as applied to "sore-winner" of primary election).
 
 
 33
 We therefore discount as insignificant the state's asserted justifications for imposing the pre-primary filing deadline upon independent candidates.
 
 
 34
 3. From our assessment of the extent of the injury to the voters' rights here at stake--"essentially total"--and of the character and magnitude of the state's asserted justifying interests--"insignificant"--it is obvious that at the third stage of the Anderson inquiry we would find the latter substantially outweighed by the former and the filing requirement therefore unconstitutional. Before concluding that, however, we think it proper to look briefly at the most obvious interest which a state has in imposing any pre-election filing deadline on ballot candidates. We do so because we believe that in the process the general constitutional limits on this particular form of ballot access restriction may be seen.
 
 
 35
 The most obvious state interest justifying any pre-election filing deadline is the need to provide a decent interval for administrative processing and for voter education. While no constitutional maximum or minimum has been developed, most states seem to have fixed on 75 to 90 days as a reasonable period to accommodate these two undoubted state interests, both as relates to primary and general[3] elections. Looking only to those interests, a state surely could require independent candidates to declare and perfect their candidacies 60 to 90 days before a general election. Beyond that period, some other interest would seem to be needed to justify an earlier declaration of independent candidacy. Here, as indicated, we have been pointed to none which we (or the Supreme Court in Anderson ) believe is sufficiently significant to justify imposing a filing deadline for independent candidates seven months ahead of the general election. Obviously, primary candidates must also be required to declare their candidacies a comparable time before the primary election in order to serve the same administrative and voter education interests that apply there. But those interests are wholly irrelevant to independent candidacies.[4]
 
 
 36
 We therefore conclude that no interests advanced by the state or noticed by us makes necessary the requirement that independent candidates declare their candidacies as early as March 30. Accordingly, we affirm the judgment of the district court declaring S.C.Code Sec. 7-11-15(3) unconstitutional and ordering that Cromer's name be placed on the 1990 general election ballot as an independent candidate for the House of Representatives from District 80.
 
 
 37
 AFFIRMED.
 
 WILKINSON, Circuit Judge, dissenting:
 
 38
 The majority's decision is a blow to the principle that parties matter in politics. Of course independent candidates are important to our system. But the majority has now imposed upon the states a constitutionally mandated preference for independent candidates over major and minor political party candidates which I think is without warrant. Because the South Carolina statute at issue only minimally burdens independent candidates and their supporters, because the distinctions between this case and Anderson v. Celebrezze are both apparent and significant, because the March 30 declaration deadline for candidacies promotes several legitimate state interests, and because the majority's rationale calls into question the election laws in a minimum of eighteen states without a sufficiently persuasive explanation, I respectfully dissent.
 
 
 39
 I shall address in the first section the burdens imposed by the South Carolina statute. In Section II, I shall address the state interests in support of it.
 
 
 40
 * The majority begins by finding that S.C.Code Ann. Sec. 7-11-15 and its March 30 declaration deadline, although applying to all candidates whether or not they seek nomination through a party, imposes a disproportionately heavy burden on independent petition candidates and their supporters. I cannot agree with this assessment of the burden on independent candidates, nor with the controlling effect the majority accords to Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), in evaluating it.
 
 
 41
 In determining the burden that state regulations place on candidates, the majority overlooks its obligation to examine state election law in its entirety. See Williams v. Rhodes, 393 U.S. 23, 34, 89 S.Ct. 5, 12, 21 L.Ed.2d 24 (1968); Socialist Workers Party v. Hechler, 890 F.2d 1303, 1306-07 (4th Cir.1989); Hall v. Simcox, 766 F.2d 1171, 1174 (7th Cir.1985). Any particular provision of election law must be evaluated in context, not standing alone. In American Party of Texas v. White, 415 U.S. 767, 775 n. 7, 777, 94 S.Ct. 1296, 1303 n. 7, 1304, 39 L.Ed.2d 744 (1974), for example, the Supreme Court upheld Texas laws that required petition candidates for state-wide office to obtain signatures from 1% of the voters participating in the last gubernatorial election, even though each signature had to be accompanied by an oath that was notarized, voters who had participated in primary elections were ineligible to sign, and all signatures had to be gathered in a 30-day period. The "totality" approach was also evident in Jenness v. Fortson, 403 U.S. 431, 438-39, 91 S.Ct. 1970, 1974, 29 L.Ed.2d 554 (1971), where the Court upheld a Georgia scheme that required signatures from a full 5% of the registered voters, because the signatures did not have to be notarized, voters who participated in primary elections were eligible to sign, and the state provided a six-month period in which to circulate petitions. A percentage of signatures cannot be evaluated outside the context of a state's entire body of electoral law, and neither can a deadline that by its nature is somewhat arbitrary.
 
 
 42
 South Carolina requires that a petition candidate obtain signatures of support from 5% of the registered voters in the appropriate geographical area, S.C.Code Ann. Sec. 7-11-70 (Law.Co-op.1976 & Supp.1989), does not require notarization of signatures, does not exclude those who voted in a party primary from signing an independent candidate's petition, and does not require a filing fee. Cromer easily obtained a sufficient number of signatures under these provisions and does not argue against them. Nevertheless, the court holds that the additional requirement that Cromer, along with all the other candidates for the office he seeks, declare his candidacy by March 30 converts this otherwise reasonable route to the general election ballot into a burden of constitutional dimensions. It rests this assertion on Anderson v. Celebrezze, and argues that independents must enjoy a constitutionally mandated position of preference which includes the right to react to the naming of major party candidates and to late developing issues.
 
 
 43
 I question both the majority's reading of Anderson and the novel constitutional rights in independent candidacies that its decision would create. South Carolina's election laws differ in material respects from the Ohio scheme struck down in the Anderson case. First, Ohio's filing deadline did not apply equally to all candidates, but excepted major party candidates. Ohio required both a statement of candidacy and a qualifying nominating petition signed by no fewer than 5,000 voters to be filed by March 20 in order for a candidate to gain access to the general election ballot. Anderson, 460 U.S. at 782-83 & n. 1, 103 S.Ct. at 1566-67 & n. 1. Major party nominees did not have to comply with that regulation, however, because their names would be placed on the general election ballot whether or not they had filed declarations of candidacy in Ohio. Id. at 799, 103 S.Ct. at 1575. In South Carolina, by contrast, all candidates must comply with the declaration deadline. Whatever burden this deadline creates is visited upon all competitors equally. There are no preferences or bypasses. Republican and Democratic party members who misjudged the odds and now would like to run against the single candidate in Cromer's district have missed their chances just as surely as has Cromer.
 
 
 44
 In addition, South Carolina does not require that the actual petition with signatures, which confirms political support sufficient to justify placement on the ballot, be filed until August. See S.C.Code Ann. Sec. 7-13-351 (Law.Co-op.Supp.1989). Thus, the burdens of having to collect signatures early in the year that the Supreme Court identified in the Ohio system are not present in South Carolina's law. An August petition deadline is well after the primaries, which are held on the second Tuesday in June. S.C.Code Ann. Sec. 7-13-40 (Law.Co-op.1976 & Supp.1989). By August following the primaries, voter interest in the campaign has increased, media attention has begun to focus, and volunteers are easier to recruit and retain than in the spring. See Anderson, 460 U.S. at 792, 103 S.Ct. at 1572. There is no requirement that independents make a showing of support or organization in March when other candidates do not. In fact, because the August petition date follows the primaries, South Carolina actually affords independent petition candidates an advantage over major party nominees who must prove qualifying support by winning the primary elections earlier in the year.
 
 
 45
 Finally, South Carolina neither "places a significant state-imposed restriction on a nationwide electoral process" nor "implicate[s] a uniquely important national interest" as did Ohio. Id. at 794-95, 103 S.Ct. at 1572-73. The Supreme Court considered the Ohio statute's effect not only in its analysis of the strength of Ohio's interests, but in its analysis of the burden on voters in a national election. See id. Whereas Ohio's rules affected Anderson supporters in the other forty-nine states by substantially reducing Anderson's access to electoral votes (Ohio was the sixth most populous state), South Carolina's law is strictly limited to state elections. This is a significant difference in the effect of the statute that should not be cast aside as irrelevant to the Supreme Court then or to our analysis today. See, e.g., Rainbow Coalition v. Oklahoma State Election Bd., 844 F.2d 740, 746 n. 9 (10th Cir.1988); Hall v. Simcox, 766 F.2d at 1176-77; Dart v. Brown, 717 F.2d 1491, 1503 (5th Cir.1983); Stevenson v. State Bd. of Elections, 638 F.Supp. 547, 552 (N.D.Ill.), aff'd, 794 F.2d 1176 (7th Cir.1986).
 
 
 46
 To summarize, South Carolina's filing deadline, unlike Ohio's in Anderson, is not applied unequally to independent candidates. It does not affect the power of voters in all other states across the nation. The factors the Supreme Court identified with regard to the troubles of gathering petition signatures early in the year do not exist under the South Carolina statute. In fact, South Carolina allows petition candidates a longer period of time in which to prove support than it allows major political party candidates. None of these burdens, which fueled the Supreme Court's decision in Anderson, are present here. The majority not surprisingly seizes the only other potentially burdensome factor mentioned in that case, an early declaration date, and argues that this factor is the only one that matters.[1]
 
 
 47
 The argument that a simultaneous declaration date in March impermissibly burdens independent candidates must rest on one of two approaches. The first examines relative deadlines, and declares that independent candidates have a constitutional right to declare their candidacies after the major parties announce their nominees. The second is based on absolute deadlines, and alleges that the state has no legitimate interest, apart from concerns of administrative convenience and voter education, in placing any time limits on petition candidates.
 
 
 48
 To the extent the majority's rationale is based on an independent's "right to react to the naming of the major parties' candidates," then thirty-two states' election laws are now constitutionally suspect because they require petition candidates to submit their signed petitions (not merely their declarations) on or before the date of the major parties' primaries.[2] If independents have only the "right to react to the naming of all the major parties' possible candidates," then merely the eighteen states that have simultaneous filing deadlines for all candidates are violating the Constitution.[3] The Supreme Court certainly does not believe any such rights of relative advantage exist. In Munro v. Socialist Workers Party, 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986), the Court upheld Washington's blanket primary system that required all candidates to participate in a single primary election and to receive at least 1% of the votes before being listed on the general election ballot. See id. at 192 & n. 4, 197 n. 11, 107 S.Ct. at 536 & n. 4, 538 n. 11. In Jenness v. Fortson, 403 U.S. at 433-34, 91 S.Ct. at 1971-72, the Court upheld Georgia's election laws, which established a simultaneous filing deadline for petition candidates and party primary candidates. See also Socialist Workers Party v. Hechler, 890 F.2d 1303 (4th Cir.1989), aff'g in part and rev'g in part Socialist Workers Party v. Hechler, 696 F.Supp. 190 (S.D.W.Va.1988) (upholding requirements that declaration be filed by thirty-one days before the primary, and signature petition by the day before the primary); Erum v. Cayetano, 881 F.2d 689 (9th Cir.1989) (nonpartisan candidates must participate in qualifying primary election); Stevenson v. State Bd. of Elections, 794 F.2d 1176 (7th Cir.1986), aff'g 638 F.Supp. 547 (N.D.Ill.) (upholding a filing deadline 92-99 days before primaries and 323 days before general election).
 
 
 49
 To the extent the majority's logic is founded on an absolute right of independents "to file as late as is administratively feasible," then twenty-eight states must now reexamine their election procedures because that many states require a declaration or petition to be filed before August 1, a date which is well beyond the majority's ninety-day maximum.[4] Not only does the majority's recognition of these asserted rights run counter to a substantial body of precedent, but it instructs the majority of states to rewrite their now illegal and burdensome laws.
 
 
 50
 The mere fact that so many states and courts are affected is, of course, no argument against the Constitution's requirements. It should, however, provide a strong signal to the court to take such a step only with the greatest justification. It was not so long ago that the Supreme Court observed that "[i]t is very unlikely that all or even a large portion of the state election laws would fail to pass muster under our cases...." Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974).
 
 
 51
 Finally, I think the theory upon which the majority relies to support either this relative or absolute right on the part of independent candidates is constitutionally suspect. All candidates, not just independent ones, would love to have the option of being able to wait as late as possible, assess opposing candidates and developing issues and then declare their candidacies. Such a tactic provides numerous advantages. First, the number of competing candidates will be fewer because primaries and conventions will have weeded out most of those seeking office. "Surely an argument could as well be made on behalf of [losing primary candidates] that it is they who were denied equal protection vis-a-vis a candidate who could have had his name printed on the ballot simply by filing a nominating petition signed by 5% of the total electorate." Jenness, 403 U.S. at 440, 91 S.Ct. at 1975 (emphasis in original). Second, the financial burdens of participating in a primary election are avoided. The petition candidate can concentrate all funds and support on a single general ballot. Third, the reputational risks that accompany prolonged public exposure are greatly diminished. In a negative campaign, a late entering candidate may possess a significant advantage over competitors who have already been scrutinized and quite probably tarnished in their bids for party nominations. Finally, all of politics is reactive. Each party and every candidate would prefer to learn the identities of opponents and the potencies of issues before sallying forth into political conflict. For every potential candidate time may prove an advantage, not just for independents. It simply is not incumbent upon the states as a constitutional matter to provide the invariable time advantage to independent candidates that the court now requires on the basis of its perception of their nature. Certainly nothing in Anderson dictates any such conclusion.
 
 
 52
 Furthermore, if the idea that independent candidates arise primarily from dissatisfaction with major party candidates and their positions is the sole or even the major explanation for Anderson 's finding of a burden under Ohio's statute, then it is a most curious case. John Anderson himself declared that he was a candidate for president some nineteen months before the 1980 general elections. 460 U.S. at 822, 103 S.Ct. at 1587 (Rehnquist, J., dissenting). His independent status was not purely a matter of idealism, but, like any other candidacy, a mixture of pragmatism and opportunism as well. Similarly, Cromer stated that he had no intention of running against a well-entrenched incumbent, for such action "would have been futile." Only after he learned of the incumbent's plans not to seek re-election did he desire to enter the political arena. Most candidacies are motivated by some admixture of altruism and ambition, and it will not do to have constitutional rules place a particular type of candidacy upon a pedestal of high-mindedness, or to cloak independents in a cause and others implicitly in self-interest.
 
 
 53
 Even if the Constitution required that independents receive a preferential right to react, the South Carolina scheme would hardly burden it. Voters can still coalesce around independent candidates late in the year. All independent candidates need do is act to preserve their opportunity. Registering as a candidate in March costs nothing, and requires no organized support or party structure. If future events do not lead to the anticipated dissatisfaction, if, for example, the disaffected persons are able to exercise the leverage of a potential candidacy to make their voice heard within the major or minor parties, then the registered candidate can simply withdraw at no cost. To comply with the March 30 deadline does require some measure of forethought, but it is a bare minimum. Independent candidates and their supporters are not necessarily spontaneously generated entities who have no prior interest in politics or are naive to political realities and it is not burdensome to request them to sign up in March to preserve a slot on the general ballot. In Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), the Supreme Court upheld California's "disaffiliation" statute, which required independent candidates to have been separated from all political parties and to have refrained from voting in other primary elections for one year prior to the primary elections. South Carolina does not demand even that degree of foresight and decision-making. It is difficult to see how its less restrictive requirement rises to the level of a constitutional violation.
 
 
 54
 Neither South Carolina's scheme in its entirety nor Sec. 7-11-15 in particular places an undue burden on independent candidates and their supporters. Whatever difficulty the declaration deadline creates is applied equally to all candidates. Virtually none of the burdens enumerated in Anderson are present under South Carolina's scheme. Independent candidates and voters can still react to later developing issues because the signature petition is not due until August. South Carolina simply has not enacted "an entangling web of election laws" that has "effectively foreclosed" access to its ballot. Williams v. Rhodes, 393 U.S. at 35, 89 S.Ct. at 12 (Douglas, J., concurring).
 
 II
 
 55
 Balanced against this minimal burden are a number of strong legitimate interests of South Carolina. "[A] State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." Anderson, 460 U.S. at 788, 103 S.Ct. at 1570. These interests are more than sufficient to justify the modest requests South Carolina makes of independent petition candidates.
 
 
 56
 I reject at the outset the argument that the state's only interest in regulating petition candidates is administrative. It has long been true that a state's interest in "maintaining the integrity of the various routes to the ballot" is a "compelling" concern. See Munro v. Socialist Workers Party, 479 U.S. 189, 195, 107 S.Ct. 533, 538, 93 L.Ed.2d 499 (1986); Storer, 415 U.S. at 733, 94 S.Ct. at 1281. States additionally have an "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot," Anderson, 460 U.S. at 788 n. 9, 103 S.Ct. at 1570 n. 9, and a compelling interest in protecting "the stability of [their] political system[s]." Storer, 415 U.S. at 736, 94 S.Ct. at 1282.
 
 
 57
 A state may establish many different routes to the general election ballot, no one "of which can be assumed to be inherently more burdensome than the other[s]." Jenness, 403 U.S. at 441, 91 S.Ct. at 1975. No law shutting independents out of the political process should ever pass constitutional muster, see Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), but states are free to prescribe the procedures for each alternate route of ballot access. For example, a state can foreclose in appropriate circumstances a direct route from petition to general election ballot and instead require minority parties and independents to participate in primary elections before obtaining access. See Munro, 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986); Erum v. Cayetano, 881 F.2d 689 (9th Cir.1989). The state can also require political organizations to participate in conventions. See American Party of Texas v. White, 415 U.S. 767, 781-82, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974). Although such "procedures are different, ... the Equal Protection Clause does not necessarily forbid the one in preference to the other." Id.[5]
 
 
 58
 Here, South Carolina has a number of interests that justify its pre-primary deadline. This court recently upheld a West Virginia statute that required both independent and third party candidates to declare their candidacies thirty-one days before the primaries and to file their supporting signatures by the day before the primaries. See Hechler, 890 F.2d 1303 (4th Cir.1989), aff'g in part and rev'g in part 696 F.Supp. 190, 197 (S.D.W.Va.1988). The district court in that case observed that:
 
 
 59
 requiring all third party and independent candidates to declare their candidacies and submit nominating petitions before the primary helps to ensure that voters are exposed to the full field of candidates and their positions on the issues during the primary election season so as to vote intelligently at the primary polls. The asserted interest of the state in ensuring a full field of candidates and positions during the primary season is a legitimate one.
 
 
 60
 Hechler, 696 F.Supp. at 200. The South Carolina statute similarly guarantees that primary voters, when selecting candidates, have at least some knowledge of the political terrain they are approaching.
 
 
 61
 In addition, South Carolina has a strong interest in treating candidates equally. As previously discussed, any candidate who could wait to declare his or her availability would obtain significant advantages on many fronts. South Carolina may legitimately not desire to extend these benefits to any single subset of candidates. If it perceives that such a privilege is necessary to counterbalance other provisions of its election code, it should be able to grant such a benefit, just as Illinois did for minor parties in Stevenson v. State Bd. of Elections, 794 F.2d 1176 (7th Cir.1986), aff'g 638 F.Supp. 547 (N.D.Ill.1986). But the Constitution does not require that South Carolina, in this one specific provision, confer a political advantage upon a single type of candidacy when all who seek public office might stand to benefit from its receipt.
 
 
 62
 Finally, and most importantly, South Carolina has a compelling interest in supporting its party system.[6] Its election scheme accomplishes this in two ways. First, it protects existent parties and their supporters from intra-party disputes spilling over into the general election. Second, to the extent that Cromer complains that he must receive special treatment because he does not have the support of an entire political apparatus, then the South Carolina system provides incentives for petition candidates to form such an apparatus as a method of sharpening debate on the issues.
 
 
 63
 In Storer v. Brown, the Supreme Court upheld California's "disaffiliation" statute, which required independent candidates to have been disaffiliated from all political parties for one year prior to the primary elections. Such a provision "protects the direct primary process by refusing to recognize independent candidates who do not make early plans to leave a party and take the alternative course to the ballot. It works against independent candidacies prompted by short-range political goals, pique, or personal quarrel." Storer, 415 U.S. at 735, 94 S.Ct. at 1281-82. Cromer's quarrel, for example, is not with the Republican party, but with its single candidate. "A demand for an easy route to the ballot by those dissatisfied with the results of the primary is precisely a demand to carry over intraparty disputes." Stevenson, 794 F.2d at 1178 (Easterbrook, J., concurring). South Carolina has an interest in protecting the integrity of its ballots from such demands.
 
 
 64
 It is true that South Carolina has enacted a "sore-loser" statute that prohibits candidates who were defeated in their party's convention or primary from running as a petition candidate. See S.C.Code Ann. Sec. 7-11-10 (Law.Co-op.1976 & Supp.1989). The statute does not apply, however, to candidates who initially choose the route of seeking their party's nomination, realize their chances are slim, and abandon the party process in order to gain a second shot at the general election ballot via a petition candidacy. The sore-loser statute thus does not, by itself, successfully prevent such intra-party disputes from carrying over into the general election. A simultaneous filing deadline, however, helps ensure that no candidate receives two bites at the apple. See Stevenson, 638 F.Supp. at 553-54. Nor must South Carolina be as harsh as California and require a one-year disaffiliation for petition candidates. South Carolina allows potential candidates to choose a petition route to the general ballot at a time closer to the primaries. The majority should not be heard to complain that South Carolina provides less protection to its parties than it has the constitutional power to grant.
 
 
 65
 The final point, an extension of the last, is that states do have an important and legitimate interest in supporting party politics in general. Political parties have been major forces in America since its founding. While this country's earliest years saw much debate over the virtues and dangers of strong parties, and in 1822, James Monroe celebrated that parties had "cooled down or rather disappeared," the Jacksonian revolution of the 1820's and 1830's provided political parties a new impetus. D. Price, Bringing Back the Parties 97-100 (1984). Since that time, strong political parties have become permanent features in our political system. Recent years, however, have seen the increasing fragmentation of political parties, as political action committees (PACs) and single interest advocacy groups have grown to dominate the landscape. Numerous commentators have lamented the declining health of our political parties, typically observing that "[n]o parties at all leaves a society out of reach, out of control, and no modernized regime can afford, in the long run, to settle on this unsafe and unproductive solution." W. Burnham, Foreword to M. Wattenberg, The Decline of American Political Parties 1952-1988 at xiii (1990) (citing Sartori, Parties and Party Systems (1976)); see, e.g., L. Sabato, The Party's Just Begun (1988); Party Renewal in America (G. Pomper ed. 1980) (collection of essays); D. Broder, The Party's Over: The Failure of Politics in America (1972).
 
 
 66
 Political parties' declines have created problems because they have historically served many important functions. Because parties represent dependable philosophies, they enable voters to make more consistent and rational choices, thereby connecting the foundation of the political order with governmental institutions. D. Price, Bringing Back the Parties 109-11 (1984). Parties also further legitimate goals by managing and contributing to conflict, informing voters, enhancing campaigns, expanding the electorate, ameliorating separation of powers, and supporting democracy. S. Frantzich, Political Parties in the Technological Age 9-14 (1989).
 
 
 67
 Perhaps their most important role, however, is in incorporating the needs and desires of disparate groups of people and "ensur[ing] that policy outcomes do not merely reflect 'the power ratio among the private interests most immediately involved' but also take into account the interests and concerns of the larger community." D. Price, Bringing Back the Parties 111 (1984). Lower socioeconomic groups, in particular, must overcome significant burdens in making their voices heard without political parties. As campaigns become more issue-oriented and less party-oriented, the power of the better-educated and upper-income groups will likely increase as well. W. Crotty, American Parties in Decline 277 (1984). Through their ability to offer access to a wide variety of interests, parties can both respond to concerns and balance them against a broader public interest. "There are no countries in which associations are more needed to prevent the despotism of faction or the arbitrary power of a prince than those which are democratically constituted." A. de Tocqueville, 1 Democracy in America 202 (P. Bradley ed. 1954) (cited in Pomper, The Contributions of Political Parties to American Democracy, in Party Renewal in America 16 (G. Pomper ed. 1980)).
 
 
 68
 One need not accept such theory as gospel; I only argue that South Carolina is entitled to rely upon it. In creating the rights that it does, the majority has simply adopted its own perspective on elections, to the exclusion of other political perspectives that may form the basis of a legitimate state interest. At a minimum, the majority must explain why South Carolina lacks a legitimate interest in strengthening its party system. Certainly, if South Carolina were to shut independents off the ballots or out of politics, we would declare its system unconstitutional. But we should not prohibit states from recognizing that, historically, "[w]ithin the American political system an independent identification has been associated with a lack of political interest and involvement." W. Crotty, American Parties in Decline 276 (1984). South Carolina is entitled to view the prospect of multiplying independent candidacies with at least a measure of ambivalence, noting that the platform for altruistic advocacy in one election may serve to proliferate single-interest or publicity-seeking ballot entries in the next.
 
 
 69
 The majority characterizes the route to the ballot that South Carolina has provided Cromer as unduly burdensome for an independent candidate. I do not believe that is so because an independent is relieved altogether from the rigorous road of a party convention or primary. To the extent it is the case, I believe South Carolina should be able to provide some incentives for potential candidates to enlist in party primaries and press their concerns within a party framework. South Carolina may permissibly view parties as an organizing and mediating force in its politics, at least to the extent that it should not be constitutionally compelled to grant candidates who run outside the party framework with a substantial filing advantage. This state interest fully justifies the small burden South Carolina has placed upon candidates like Cromer.
 
 III
 
 70
 I would not give state legislatures a license to exclude candidates like Cromer from our system or to deprive voters of their viewpoints. South Carolina, however, has not established an elaborate system of hoops and pitfalls in which to snare independent candidates and their supporters. The small burden of making a declaration along with all other candidates is outweighed by the many state interests that requirement supports and by the vitality the requirement lends to the workings of party politics. Whether or not South Carolina's approach is wise, I am convinced that it does not violate the Constitution. For that reason I would reverse the judgment of the district court and affirm the validity of South Carolina's declaration deadline.
 
 
 
 [1]
 The narrow question of the constitutionally permissible timing of a filing deadline for independent candidates has only been considered by the Supreme Court in Anderson. Because that is the narrow basis of challenge here, Anderson is the most direct authority on the issue. Both Munro v. Socialist Workers Party, 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986), and Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), which the dissent cites in support of its position, at 829, involved challenges to other forms of ballot access restriction: Munro, to Washington's employment of a single open primary, held in September; Jenness, to Georgia's requirement that independent candidates have 5% voter-signature support
 
 
 [2]
 Though the dissent, on its own, ranges more widely and deeply in political theory in hypothesizing possible state interests, the only ones "precisely put forward by the state" itself, Anderson, 460 U.S. at 789, 103 S.Ct. at 1570--and those only in the form of litigation positions advanced by counsel--are those identified in text. If these interests, particularly the profound philosophical ones suggested by the dissent, are indeed those underlying this legislation, it may be thought remarkable that they did not prompt legislative action until as late in the state's long history as 1988
 
 
 [3]
 As reflected in the fact that the latest current primary dates--those in August and September--provide a 75 to 90 day interval between the date of primary election results and the general election for voter education and election preparations
 
 
 [4]
 The dissent's ominous suggestion that our rationale makes thirty-two states' election laws constitutionally suspect because they require pre-primary filing by independent candidates, at 828, is unfounded
 The critical constitutional flaw in a March 30 deadline lies not in the fact that it precedes party primaries, but in the sheer length of time by which it precedes the general election. This is the principal point in Anderson. A more careful appraisal of the thirty-two states in question would therefore note that twenty hold their primaries as late as August, so that the opportunity for major issues to emerge in the post-primary interval (a critical factor in the Anderson analysis) is minimal. It would also note that fourteen of the thirty-two, including half of those with primaries earlier than August, allow independent candidates to file after primary candidates have filed, thereby further relieving the burden imposed by South Carolina's simultaneous filing rule.
 A truer assessment, for what it may be worth, of how South Carolina's pre-primary deadline for independents stacks up with other states on the truly critical factors would be as follows: only six states other than South Carolina combine the two most critical burdens on independent candidacies: sheer length of time between filing date and general election (as much as seven months), and simultaneous filing deadlines for independents and primary candidates.
 If these states' filing deadlines are made constitutionally suspect by these features, it is by Anderson 's rationale, not ours.
 
 
 [1]
 Such an assertion ignores the totality approach that this circuit has always applied in election cases. In Socialist Workers Party v. Hechler, 890 F.2d 1303 (4th Cir.1989), this court upheld a West Virginia statute that required independent and third-party candidates to declare their candidacies thirty-one days before the primaries and to file their supporting signatures by the day before the primaries. There we observed that "[i]t is not enough for the plaintiffs to make a limited comparison of the West Virginia scheme with the Texas scheme upheld by the Supreme Court in American Party [of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) ], find some way in which the West Virginia plan is more restrictive, and therefore expect this court to declare it unconstitutional." Hechler, 890 F.2d at 1306. Similarly, it cannot be that Cromer can discover one way in which South Carolina's scheme is similar to Ohio's scheme and then demand that this court strike it down as unconstitutional. The analysis is not so simplistic
 
 
 [2]
 See Ala.Code Sec. 17-7-1(a)(3) (1987); Alaska Stat. Secs. 15.25.020, 15.25.140, 15.25.150 (1988 & Supp.1989); Ark.Stat.Ann. Sec. 7-7-103(b) (1987 & Supp.1989); Colo.Rev.Stat. Sec. 1-4-801(h) (1980 & Supp.1989); Conn.Gen.Stat.Ann. Secs. 9-405, 9-453i(a) (West 1989 & Supp.1990); Del.Code Ann. tit. 15, Secs. 3002(b), (d), 3101 (1981); Fla.Stat.Ann. Secs. 99.061, 99.0955 (West 1979 & Supp.1989); Ga.Code Ann. Secs. 21-2-132(c), (d), 21-2-150(a) (1987 & Supp.1990); Ill.Ann.Stat. ch. 46, pp 7-12, 10-3 (Smith-Hurd 1965 & Supp.1990); Kan.Stat.Ann. Secs. 25-203, 25-305 (1986 & Supp.1989); Ky.Rev.Stat.Ann. Sec. 118.365(6) (Michie/Bobbs-Merrill 1982 & Supp.1990); Me.Rev.Stat.Ann. tit. 21-A, Sec. 354(8-A) (Supp.1989); Md.Ann.Code art. 33, Secs. 4A-3, 7-1(b)(1)(i) (1986 & Supp.1989); Mass.Gen.Laws Ann. ch. 53, Secs. 7, 10, 28 (1975 & Supp.1990); Mich.Comp.Laws Ann. Sec. 168.534, 168.590c(2) (West 1989); Minn.Stat.Ann. Sec. 204B.09 (Supp.1990); Miss.Code Ann. Sec. 23-15-359(1), (3), (4) (Supp.1989); Mo.Ann.Stat. Secs. 115.121, 115.329 (Vernon 1980 & Supp.1990); Mont.Code Ann. Secs. 13-1-104(1), 13-1-107, 13-10-503(1), (2) (1989); Nev.Rev.Stat.Ann. Secs. 293.175, 293.200(2), (4), (10) (Michie 1990); N.H.Rev.Stat.Ann. Secs. 655:14, :14-a (1986); N.J.Stat.Ann. Sec. 19:13-9 (West 1989); N.Y.Elec.Law Secs. 6-158 p 9, 8-100 (McKinney 1978 & Supp.1990); Ohio Rev.Code Ann. Sec. 3513.257 (Pages 1988); Okla.Stat.Ann. tit. 26, Secs. 1-102, 5-110 (1976 & Supp.1990); R.I.Gen.Laws Secs. 17-14-1, 17-14-12 (1988 & Supp.1989); Tenn.Code Ann. Secs. 2-5-101(a)(1), 2-13-202 (1985 & Supp.1990); Tex.Elec.Code Ann. Secs. 142.002(b)(2), 142.006, 172.023 (Vernon 1986 & Supp.1990); Utah Code Ann. Secs. 20-3-38(2)(a), 20-4-9, 20-3-8(1) (1984 & Supp.1990); Va.Code Ann. Secs. 24.1-166, -174 (1985); W.Va.Code Ann. Secs. 3-5-23, 3-5-24 (1990); Wis.Stat.Ann. Secs. 5.62, 8.20(8)(a), 8.21 (West 1986 & Supp.1990)
 An additional three states require all candidates to participate in primary elections and, thus, to declare their candidacies before the primaries. See Haw.Rev.Stat. Secs. 12-2, 12-6 (1985 & Supp.1989); La.Rev.Stat.Ann. Secs. 18:481, :461, :468 (West 1979 & Supp.1990); Wash.Rev.Code Ann. Secs. 29:18:030, 29:18:025, 29:18:110 (1965 & Supp.1990).
 
 
 [3]
 Alabama, Connecticut, Florida, Illinois, Kentucky, Maryland, Massachusetts, Minnesota, Mississippi, Montana, New Hampshire, New Jersey, Oklahoma, Rhode Island, Tennessee, Texas, Utah, and Wisconsin. If those states that conduct mandatory primaries are included (Hawaii, Louisiana, and Washington), then the list expands to twenty-one
 
 
 [4]
 See Ala.Code Secs. 17-7-1(a)(3), 17-16-6 (1987 & Supp.1990); Ark.Stat.Ann. Sec. 7-7-103(b) (1987 & Supp.1989); Fla.Stat.Ann. Secs. 99.061, 99.0955, 100.061 (West 1979 & Supp.1989); Ga.Code Ann. Secs. 21-2-132(c), (d), 21-2-150(a) (1987 & Supp.1990); Idaho Code Sec. 34-708 (1981 & Supp.1990); Ill.Ann.Stat. ch. 46, pp 2A-1.1, 7-12, 10-3 (Smith-Hurd. 1965 & Supp.1990); Ind.Code Ann. Sec. 3-8-6-10 (Burns 1988 & Supp.1990); Ky.Rev.Stat.Ann. Secs. 118.025(3), 118.365(6) (Michie/Bobbs-Merrill 1982 & Supp.1990); Me.Rev.Stat.Ann. tit. 21-A, Secs. 339, 354(8-A) (Supp.1989); Md.Ann.Code art. 33, Secs. 4A-3, 5-2, 7-1(b)(1)(i) (1986 & Supp.1989); Mass.Gen.Laws Ann. ch. 53, Secs. 7, 10, 28 (1975 & Supp.1990); Mich.Comp.Laws Ann. Sec. 168.534, 168.590c(2) (West 1989); Minn.Stat.Ann. Secs. 204B.09, 204D.03 (Supp.1990); Miss.Code Ann. Sec. 23-15-359(1), (3), (4), 23-15-191 (Supp.1989); Mont.Code Ann. Secs. 13-1-104(1), 13-1-107, 13-10-503(1), (2) (1989); Nev.Rev.Stat.Ann. Sec. 293.175, 293.200(2), (4), (10) (Michie 1990); N.J.Stat.Ann. Secs. 19:13-9, :23-40 (West 1989); N.M.Stat.Ann. Sec. 1-8-52 (1985 & Supp.1990); N.C.Gen.Stat. Sec. 163-122 (1987); Ohio Rev.Code Ann. Secs. 3513.01, 3513.257 (Pages 1988); Okla.Stat.Ann. tit. 26, Secs. 1-102, 5-110 (1976 & Supp.1990); R.I.Gen.Laws Secs. 17-14-1, 17-14-12, 17-15-1 (1988 & Supp.1989); Tenn.Code Ann. Secs. 2-5-101(a)(1), 2-13-202 (1985 & Supp.1990); Tex.Elec.Code Ann. Secs. 142.002(b)(2), 142.006, 172.023 (Vernon 1986 & Supp.1990); Utah Code Ann. Secs. 20-3-38(2)(a), 20-4-9, 20-3-8(1) (1984 & Supp.1990); Va.Code Ann. Secs. 24.1-166, -174 (1985); W.Va.Code Ann. Secs. 3-5-1, 3-5-23, 3-5-24 (1990); Wis.Stat.Ann. Secs. 5.62, 8.20(8)(a), 8.21 (West 1986 & Supp.1990)
 
 
 [5]
 The Seventh Circuit, for example, has upheld an Illinois election scheme in which third parties did not have to file supporting petitions until well after both major parties and independent candidates. See Stevenson v. State Bd. of Elections, 794 F.2d 1176 (7th Cir.1986) (adopting the district court opinion at 638 F.Supp. 547 (N.D.Ill.1986)). This difference in treatment was justified because independent and major party candidates did not have the burden of creating distinct political organizations and entire party platforms and could therefore focus on individual campaigning, whereas minor parties suffered organizational problems in complying with requirements such as having to produce entire slates of candidates. Stevenson, 638 F.Supp. at 554. However, under the majority's current mandate that independent candidacies must be accorded even more protection than third party candidacies, such disparate treatment would clearly be unconstitutional, regardless of the other burdens Illinois placed on new parties
 
 
 [6]
 The majority's own recitation of the state interest in "preventing splintered parties and unrestrained factionalism" makes plain that this is not a hypothetical state interest but one that the state has identified and advanced in this litigation. Indeed, South Carolina's extensive reliance here upon Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), makes it difficult to argue that the state did not consider the integrity of its party system to be at stake